SWEET *v.* WESTERN UNION TELEGRAPH CO.

1. TRIAL—INSTRUCTIONS—REFUSAL—HARMLESS ERROR.
   The refusal of a proper request is not reversible error where its substance was given in others.

2. TELEGRAPH COMPANIES—DELIVERY OF MESSAGES.
   Where a telegram is sent to one person in care of another, delivery to the latter is sufficient.

3. DAMAGES—REMOTENESS—CONTINGENT INTEREST.
   Damages to an attorney for nondelivery of a telegram instructing him to attend a hearing on claims against an estate are too remote and speculative for recovery, where it appears that the hearing was adjourned and in the interim the claim was compromised, and that plaintiff's interest in prosecuting it was contingent on success.

Error to Cass; Carr, J. Submitted February 9, 1905. (Docket No. 124.) Decided March 14, 1905.

Assumpsit by Charles E. Sweet and Clyde W. Ketcham, copartners as Sweet & Ketcham, against the Western Union Telegraph Company for an alleged failure to deliver a message. There was judgment for defendant, and plaintiffs bring error. Affirmed.

*Charles E. Sweet* (*James H. Kinnane,* of counsel), for appellants.

*Gore & Harvey* (*C. A. Kent,* of counsel), for appellee.

MOORE, C. J. This case was brought in justice's court to recover damages for the nondelivery of a telegram. The case was appealed to the circuit court, where it was tried by a jury, which returned a verdict in favor of the defendant. The case is brought here by writ of error.

There are upwards of 20 assignments of error, many of which it will not be necessary to discuss.

The record discloses that plaintiffs, who live at Dowagiac, are attorneys who were acting for Lucy Jarvis in a claim she had against the estate of Burton Jarvis.  It was expected this claim and others would be heard before the commissioners on claims at Buchanan, and on the 24th of September, 1902, Mr. Ketcham went to Buchanan to look after it.  He obtained information early in the day which led him to believe that because of the hearing of other claims the hearing of this claim would not be heard that day, and, after arranging with his client what to do in case the claim was reached, he went on before noon to Benton Harbor.  It became evident to Miss Jarvis later that the case would be reached on the 25th, and she communicated that fact by telephone to Mr. Sweet, who sent the following:

"DOWAGIAC, September 24, 1902.
"To CLYDE W. KETCHAM,
   "Care John Doelle,
     "Benton Harbor, Mich.,
      "Principal of High School.
"Attend Buchanan case tomorrow without fail; I can't.
                     "C. E. SWEET."

Mr. Sweet heard nothing further from the telegram that day, and at 6 o'clock went to Grand Rapids.  The telegram was forwarded to Benton Harbor, given to the messenger, and taken to Mr. Doelle.  What then occurred is the subject of conflicting testimony.  Mr. Doelle's version is as follows:

"After dinner we [Mr. Ketcham and Mr. Doelle] went direct to the schoolhouse.  He remained until the last bell began to ring; that was about 1:30.  I knew where he was going when he left.  He was going to Grand Rapids on the next train.  I knew from what depot that train would go.  The messenger of the Western Union came to me at the high school.  I know I looked at my watch when he came, to see whether he had time to go to the train and get Mr. Ketcham before the train

should leave. It was either 2 o'clock or ten minutes to 2. It was between those two. I told the messenger boy that Mr. Ketcham was going to Grand Rapids on the next train, and that I thought he would have time to reach him at the depot before the train should leave. There is but one depot at Benton Harbor from which you can go, by direct route, to Grand Rapids. The boy came back between 3 o'clock and 10 minutes to 4. Said he had not found Mr. Ketcham, and I told him to forward the message to Grand Rapids, care of the State convention. I paid him 25 cents to forward the message. I ascertained from the Western Union office that the telegram had arrived at 12.53."

On cross-examination he testified:

" *Q.* So the message was delivered to you at the schoolhouse?

"*A.* Yes, sir.

" *Q.* And I believe you receipted for it?

"*A.* I did not receipt for it.

" *Q.* You are positive of that?

"*A.* Yes, I am as positive as I can be.

" *Q.* But it was delivered to you?

"*A.* It was delivered to me; yes, sir.

" *Q.* About 2 o'clock or ten minutes to 2?

"*A.* About ten minutes to 2 or 2 o'clock; yes, sir.

" *Q.* I wish you would look at this delivery sheet, and answer me if this is your signature, ' J. Doelle?'

"*A.* Why, that looks something like it. I don't write like that very often.

" *Q.* That is the way you would write in pencil, isn't it?

"*A.* Perhaps it would be; yes, sir.

" *Q.* Is that your signature?

"*A.* It looks like it.

" *Q.* Would you say that it is not?

"*A.* I won't say that it is not.

" *Q.* What do you say whether or not that is your signature or not?

"*A.* I may have receipted for it the second time when he came back and I paid him the quarter to forward it. As to that I am not clear.

" *Mr. Gore :* We offer the delivery sheet in evidence. (Paper referred to marked ' Exhibit B')."

Redirect examination by Mr. Kinnane:

"When I say 'delivered it' I mean that they brought that message to the schoolhouse thinking I was the man who knew where Mr. Ketcham was. I believe I didn't have it in my hands. I may have taken it in my hands and looked at the address. I don't know whether I did or not. I didn't open it, nor see it opened in my presence, and did not retain it. I told the delivery boy that Mr. Ketcham was going to Grand Rapids on the next train, and I thought he would have time to get there. That was the first time."

The messenger testified:

"I went to dinner that day at 12:30; returned at 1:30. There were three messages waiting for me. I left the office with them about 1:35.

"*Q.* I hand you delivery sheet marked 'Exhibit B,' dated September 24, 1902, and ask you if you had that sheet in your possession that day?

"*A.* Yes, sir. I delivered the message to Squier at 1:40. I delivered a message to Mr. Squier and one to Mr. Walton before delivering the one to Mr. Doelle. I went straight to the schoolhouse, and found Mr. Doelle, and presented the message. I think he had it in his hands, but I think I took it back to the office. I am pretty sure he had it in his hands. I saw Mr. Doelle write his signature there, ' J. Doelle,' under message No. 22. I am sure. I think he made the figures ' 2 :06.' I think I remember his taking out his watch and putting down the time. He said Mr. Ketcham had left for Grand Rapids; to forward the message there. Mr. Doelle did not say anything to me about Mr. Ketcham being at any railway station. When I reported at the office they wanted an address at Grand Rapids. I went back to the high school for an address. I went back immediately. I saw Mr. Doelle on this second occasion, and asked him for an address. And he said he didn't know where Mr. Ketcham would be that day, but the next day he would be at the State convention there; a republican convention. I went back to the office, and told them what he said, and they wanted a guaranty before they could forward the message. They told me to go back to the high school for the guaranty. I did that. That was the third time. He said he would guarantee it, and I went back to the office, and they wanted a deposit. I went back, and he said he had no money, but to come up

to his house at 5 o'clock, but to forward the message as soon I got back. I went to Mr. Doelle's that evening, and got the money at 5 o'clock at his house. I returned the money to Mr. Doelle some time within the next three days. Nothing was said during any of my interviews with Mr. Doelle about going to the railway station.

" Q. Do I understand you to say that when you first went to Mr. Doelle with this message he told you that Mr. Ketcham had left for Grand Rapids ?

" A. Yes.

" Q. Was that the reason you didn't go to the station ?
" A. Yes, sir."

On cross-examination :

"Q. You are quite positive, are you, that Mr. Doelle took out his watch and looked at it, and then wrote these figures ?

"A. Yes, sir.

"Q. '2:06' down there ?

"A. Yes, sir; I remember. * * * When I delivered this message to Mr. Doelle, he was at the schoolhouse, in the assembly hall. He looked at his watch. I think he said it was 2:06.

"Q. And then he said to you that Mr. Ketcham had gone to Grand Rapids ?

"A. Yes.

"Q. Had gone on the train ?

"A. He said he had left for Grand Rapids. I kept the message. I didn't go to the depot. It would have been two blocks down there to the depot and two blocks back."

The message was not forwarded to Grand Rapids, but was returned to Dowagiac after Mr. Sweet had taken a train to Grand Rapids. It was not until the morning of the 25th, when Mr. Sweet and Mr. Ketcham met in Grand Rapids, that the latter learned a telegram had been sent, and the former that Mr. Ketcham had not received it.

What occurred at Buchanan is shown by the testimony of Miss Jarvis, which will throw light upon several important features of the case. It is as follows:

"I live in Dowagiac, and have lived there all my life. Am one of the legatees of Burton Jarvis estate. I had a claim against this estate for $391. I placed it with Sweet

& Ketcham for adjustment. On September 24, 1902, I
went before the commissioners on a hearing on that claim.
Mr. Ketcham went with me. He went to Buchanan, and
found that my case would not be heard that day. Mr.
Ketcham said he would go to Benton Harbor, as he had
business there, and that, in case my case would be heard the
next day, he would return. He told me for any informa-
tion I wished to telephone Mr. Sweet. I telephoned Mr.
Sweet, and told him that my case would not be heard that
day, but perhaps it would be the next day. I heard, after
Mr. Ketcham had left, that I was to have my witness
there the next day, and I telephoned Mr. Sweet to see this
witness, and have her come, which he did. I told him
Mr. Ketcham had gone to Benton Harbor, and Mr. Sweet
said he would recall him, and that he would be there the
next day. Afterward I talked with Mr. Sweet again over
the phone. He informed me that my attorney would be
on hand the next day. My attorney was not there the
next day. My witness came, and I asked Mr. Roe to rep-
resent me that day; to hear Miss Allen, my witness. The
hearing was not finished, and it was adjourned until the
7th of October for hearing the witness that was to appear
on the other side against me. It was adjourned on motion
of the other side. I left, thinking that I would come back
the 7th. Then I heard that my cousin had settled, and I
was nervous. Well, I settled it also.

" *Q.* If your attorneys had been there, I will ask you if
you had entertained any such proposition?

"*A.* No.

"*Mr. Gore:* We object to it, your honor, as speculat-
ing. She cannot tell. (Objection sustained; to which
ruling plaintiffs, by their counsel, duly excepted.)"

On cross-examination:

" I settled for $68. I paid Sweet & Ketcham $8. This
made a total of $132 that I received—$64 of Mr. Jar-
vis in his lifetime and $68 from his estate. I had an ar-
rangement with Sweet & Ketcham. Was to pay them
one-half of the claim if it was allowed. If it went to cir-
cuit court, they were to have whatever the fees were.

"*Q.* So that their interest in this matter was dependent
upon their success?

"*A.* Yes, sir. I made my settlement with Mr. Worth-
ington, the executor of the estate, and went before the com-
missioners and they O. K.'d the settlement."

On redirect examination:

"If the claim was appealed, the pay of my attorneys would not depend upon whether they won the case or not. They were then to be paid for whatever they did."

There was other testimony offered, some of which was received and some rejected, relating to other branches, to which we deem it unnecessary to refer.

The trial judge charged the jury, among other things, as follows:

" This is an action by plaintiffs for damages they claim they suffered by the nondelivery of a telegram by the defendant. Coming right to the points in issue, it is the duty of the telegraph company to promptly deliver any message which is given to them for transmission and delivery, and a failure to deliver promptly makes them liable in damages, and it is a question for you to find, from the facts in this case, whether there was prompt delivery of the message in question. People send messages by telegram instead of by mail because they are in need of haste, and when a message is so sent and received it must be delivered with reasonable dispatch in all cases, and, if not, the company must pay damages for failure to so deliver. And it is for you to say whether, under all the circumstances of this case, there was such prompt delivery of the message as will relieve the defendant company from liability. The telegram in question demonstrated upon its face that it was an urgent message, and must be delivered with haste, and in such case a greater degree of diligence must be exercised than if no such urgency was expressed, and you will take this into consideration in considering the facts and making up your verdict. The telegraph is resorted to by the public to secure the speediest mode of communication, and the prompt delivery is of the very essence of the undertaking by the company. Hence a failure to make such prompt delivery, if shown in this case, requires a verdict at your hands for the plaintiffs, as hereafter indicated. If you find from the evidence that the defendant sent the message in question with reasonable promptness, and delivered the same to Mr. Doelle with reasonable diligence, your verdict must be for the defendant. On the question of prompt delivery, you are to take into account the distance of the place of delivery from the defendant's office, the distance from the office to

the schoolhouse, and the necessary time it would take to get there. The burden is on the plaintiffs to show by the preponderance of the evidence that the allegations in the declaration are true, and, if the evidence on behalf of the plaintiffs fails to do this, or such evidence is fully met by evidence on behalf of the defendant, then I instruct you that the plaintiffs cannot recover. The plaintiffs cannot recover unless by the neglect of some duty the company owed them; and, if the message was delivered to Mr. Doelle with reasonable diligence, your verdict must be for the defendant. * * *

"If you find that the company did not deliver this telegram, as I have indicated, with such promptness as was required under the circumstances, and are liable for a failure to so deliver, then you will find for the plaintiffs such an amount as will be reasonable under all the facts in the case. In other words, if you find for plaintiffs, your verdict will be for what the services of Mr. Ketcham would reasonably be worth before the commissioners, on trying the client's case, at the rate per day as shown by the evidence in this case."

The plaintiffs preferred the following request, which was refused:

"I charge you that if you find that the messenger boy did not give the message to Doelle the first time he (the messenger boy) came to the schoolhouse; that the messenger boy kept the message in his hand, and that Doelle did not sign the delivery sheet the first time the messenger boy came, and that Doelle only directed the messenger boy to go on to the Pere Marquette station—then I charge you that there was no delivery of the message at this time."

Complaint is made of the failure to give this request. It might have been well to give it, but, when taken in connection with what was given, a failure to give it was not, we think, reversible error. There was no claim there was any delivery of the message, unless the proofs disclosed there was a delivery to Mr. Doelle. In relation to that there was a conflict of testimony. The jury were told if the defendant did not deliver the message with such promptness as was required under the circumstances, they

should find for the plaintiff. This was stated in several ways, so that we do not think the jury misunderstood.

The conflicting testimony presented a question of fact as to whether there had been a delivery to Mr. Doelle, which was decided by the jury in favor of the contention of defendant.

In section 414, Croswell on Electricity, it is said:

" Although the duty of the telegraph company is to deliver to a certain person, it may not always be bound to deliver to the person for whom the telegram is intended, for, if the telegram is addressed to X., 'in care of' Y., the telegraph company may deliver the telegram to Y. without being guilty of any negligence even if it fails to reach X."

In section 748, Joyce on Electric Law, it is said:

" The same rule of diligence, the same requirement of prompt delivery, and the same obligation to find the person in whose care a message is addressed, undoubtedly applies as that which governs in the delivery of messages to the addressee himself."

Section 750 reads:

"If a person in whose care a message is sent refuses to receive or accept it, the telegraph company has fulfilled its duty in tendering it to such person."

Section 751 reads:

"Where a telegram is sent to one person in care of another, delivery to the latter is, as a rule, sufficient."

In *Western Union Tel. Co.* v. *Young*, 77 Tex. 245, the message was directed to "Mrs. N. Young, care W. R. Henry & Co., Fort Scott, Kansas." The court say:

" There was evidence to show that on the morning of the day it was received for transmission, it was delivered to W. R. Henry of the firm of W. R. Henry & Co. and that he declined to forward it and handed it back to the messenger. The court instructed the jury, in effect, that if the defendant's agent at Fort Scott tendered the message to W. R. Henry, and he declined to receive it, and

gave the messenger such directions as would have enabled him to find plaintiff's wife by the exercise of reasonable diligence, then it was the duty of the agent to use such diligence to find and deliver the message to her. We think the court erred in giving this instruction. The liability of the company must be determined by the terms of its contract. Its obligation was not to deliver to W. R. Henry & Co. and to Mrs. Young, but to deliver to them as her agents, properly addressed to her, to be dealt with by them as they deemed best. The direction to 'Mrs. N. Young, care of W. R. Henry & Co.,' has the same meaning and legal effect as it would have had if the direction had been to 'W. R. Henry & Co., for Mrs. Young.' The company contracted to deliver to W. R. Henry & Co. for the benefit of the plaintiff's wife; and when they delivered to a member of that firm their liability was at an end. The court should have so charged the jury."

In *Western Union Tel. Co.* v. *Elliott*, 7 Tex. Civ. App. 482, the court said:

"It is equally well settled that a delivery of the message to the person in whose care the same is addressed is a full performance of the contract by the company, so far as delivery is concerned."

In *Lefler* v. *Telegraph Co.*, 131 N. C. 355 (59 L. R. A. 477), the court say:

"The message was delivered to Johnson [the agent of the party in whose care the message was sent] in proper time, and eliminates the discussion of any negligence there may have been in sending the message, as no negligence can avail the plaintiffs that did not cause the injury."

The court further say:

"The court properly instructed the jury that Johnson was a proper agent of the Southern Railway Company, to whom a delivery of the message might be made, and a delivery to him was a delivery to the Southern Railway Company, and, as the message was directed to Price Lefler in care of the Southern Railway Company, the said company was made his agent, and a delivery to the agent discharged the defendant from further liability on account of the message. *Western Union Tel. Co.* v. *Houghton*, 82 Tex. 561 (15 L. R. A. 129); *Western Union*

*Tel. Co.* v. *Young,* 77 Tex. 245. These cases were cited by the plaintiffs for the purpose of showing that, although the telegram was sent in care of the Southern Railway Company, it was still the duty of the defendant to make diligent inquiry for Price Lefler, which the plaintiffs allege was not done. But upon examination of the cases it will be seen that this is only necessary when the party in whose care the message is sent cannot be found. When he is found, and delivery made to him, the defendant has nothing further to do with the telegram."

See, also, *Western Union Tel. Co.* v. *Barefoot,* 97 Tex. 159 (64 L. R. A. 491); *Western Union Tel. Co.* v. *Mitchell,* 91 Tex. 454 (40 L. R. A. 209).

We have not overlooked the cases cited on this point by plaintiffs. In *Western Union Tel. Co.* v. *Cooper,* 71 Tex. 507 (1 L. R. A. 728), the distinction from the case at bar may be noted. In that case the message was not sent in care of a third person, and was not delivered. The messenger went twice to the office of the physician, and, failing to find him, did not look further. The messenger personally knew the physician well, and it is held in this case that diligence required that the messenger should look for the physician upon the streets. In the case at bar the message, according to the finding of the jury, was delivered to the person in whose care it was sent. An examination of the other cases cited will show they are easily distinguishable.

There is another reason why the case should be affirmed. There is no dispute as to what the contract was between Miss Jarvis and the plaintiffs. Their compensation was to depend upon a contingency. No one can say she had a claim which could certainly be enforced. It is purely conjecture whether plaintiffs, had the litigation proceeded, would have been in a position to assert a claim against her. The damages claimed are too remote, uncertain, and speculative to entitle them to recover in this action. The plaintiffs, by their declaration, seek to recover in this action only for damages to business and reputation. No evidence of loss growing out of injury to repu-

tation was given. The loss in the way of business which they seek to recover was their interest in the claim of Miss Jarvis against the estate of Burton Jarvis. What was that interest? At this point we enter the realm of speculation. Miss Jarvis, though her case was adjourned at the request of the estate to October 7th, which would have given her ample opportunity to consult plaintiffs, deemed it wise to settle the claim for $68. Suppose it had been litigated, instead of settled, who can say what the result would have been? Upon this branch of the case we think the judge might very properly have directed a verdict in favor of defendant. 25 Am. & Eng. Enc. Law (1st Ed.), pp. 836–839, cases cited; *Bodkin* v. *Telegraph Co.*, 31 Fed. 134; *Baldwin* v. *Telegraph Co.*, 45 N..Y. 744; *Chapman* v. *Telegraph Co.*, 90 Ky. 265; *First National Bank of Barnesville* v. *Telegraph Co.*, 30 Ohio St. 555; *Western Union Tel. Co.* v. *Graham*, 1 Colo. 230; *Hibbard* v. *Telegraph Co.*, 33 Wis. 558; *Cahn* v. *Telegraph Co.*, 46 Fed. 40.

Judgment is affirmed.

Carpenter, McAlvay, Grant, and Hooker, JJ., concurred.